Argued April 28, reversed and remanded May 27, 1975

COPELAND ET AL, *Respondents, v.* PUBLIC
UTILITY COMMISSIONER, *Appellant.*
535 P2d 569

*John W. Burgess,* Assistant Attorney General, Salem, argued the cause for appellant. With him on the briefs were Lee Johnson, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

*W. W. Balderree,* Grants Pass, argued the cause and filed a brief for respondents.

Robert R. Hollis, Portland, filed an amicus curiae brief on behalf of respondents.

Before Schwab, Chief Judge, and Langtry and Tongue, Judges.

TONGUE, J., pro tempore.

This is a suit under ORS 756.580 to reverse an order by the Public Utility Commissioner approving the assessment of highway use taxes against plaintiffs

in the sum of $7,713.34 for hauling sand and gravel from their operations on the Rogue River to their rockcrusher and processing plant in Grants Pass.

The sole issue is whether, under the facts of this case, the hauling of such sand and gravel constituted "the transportation of sand [and] gravel * * * in connection with highway or other construction projects" within the meaning of ORS 767.335(3),[1] so as to entitle plaintiffs to pay "annual fees for such operation," as provided by that statute, "in lieu of" highway use taxes on a mileage basis.

The Commissioner interpreted ORS 767.335(3) to mean that "a carrier would not qualify for flat fee payments if the carrier was engaged in the transportation of the materials to a processing plant or to a stockpile not at the construction site"; that the application of the statute was limited to "the delivery of sand and gravel directly to highways or other construction projects," and that "any variance such as taking the raw materials to a plant for further processing or manufacturing would prevent the carrier from availing himself of the benefits contemplated in said statute."

Plaintiffs contend, to the contrary, that "so long as the product is hauled in connection with construction projects that Plaintiffs' operation qualifies for the flat fee rate regardless of an interrupted act of transportation." The trial court agreed, holding that "To put any other interpretation on the meaning of such words ['in connection with highway or other construction projects'] is injecting words not in the stat-

[1] ORS 767.335(3) (now ORS 767.825(3) in substance) provides:

"In lieu of other fees provided in ORS 767.325, carriers engaged * * * in the operation of motor vehicles equipped with dump bodies and used exclusively in the transportation of sand, gravel, rock, dirt, debris, cinders or asphaltic concrete mix in connection with highway or other construction projects, may pay annual fees for such operation * * *."

ute and which are not necessary to read into the statute in order to determine the meaning thereof."

■ In considering this problem we start with the statutory requirement that in such a suit "the burden of proof is upon the party seeking to * * * vacate or set aside * * * the order to show by clear and satisfactory evidence that the order is unreasonable or unlawful." ORS 756.594.

From the opposing positions of the parties, as stated above, it would appear that the question presented for decision by the parties to this case is whether *any* interruption in the hauling of sand and gravel to a construction site for purposes of "processing" would disqualify its initial hauling from the river or other original source to the processing plant, regardless of whether the sand and gravel is ultimately used in highway or other construction projects.

Although the parties take opposite positions on that issue we find that we need not decide that ultimate question because we find that the order of the commissioner was not shown by plaintiffs to be "unreasonable" as applied to the facts of this case and to the operation of this business. Upon examination of the record we find facts which we consider to be important and controlling in the disposition of this case, but which were not mentioned by the trial court or by either party in briefs or argument.[2]

[2] Findings of fact by the trial court include the following:

"Plaintiffs operate a sand, gravel and asphalt paving business, and in connection with the operation of the business operate dump trucks and equipment for the hauling of sand, gravel and asphaltic concrete mix, which material is used by Plaintiffs in connection with their own construction projects and sold and delivered to various contractors for use in connection with construction projects.

"* * * [T]he gravel is produced from Rogue River and hauled to the rock crushing plant in Grants Pass, and from there the material is hauled for use in connection with the construction projects."

This is not a case in which an operator first hauls sand and gravel from a riverbed to his rock crushing plant and then hauls it himself to a construction site. Neither is this a case in which it appears from the record that the sand and gravel, after being processed in plaintiffs' rock crushing plant, is then hauled directly as sand and gravel by any other party to a construction site. Accordingly, we need not consider the application of ORS 767.335(3) in such cases.

■ Instead, it appears from the record that after the hauling of the sand and gravel from the river to plaintiffs' rockcrusher (the hauling in issue in this case) it is processed and "we stockpile it in the yard" and that much of it is then sold to other operators who sell "ready-mix" concrete, although how much is sold for that purpose is not entirely clear.[9]

---

More accurately, the function of the trial court under ORS 756.598 is limited to a determination of whether the findings by the Public Utilities Commission were supported by the record, rather than to make its own findings of fact.

[9] The following appears from the record:

"Q  *  *  * Then, the majority of the cases when the material can't be used in that way, what has to be done to it? What's done to it to make it available for highway or other construction jobs?

"A  Well, we haul it and run it through our washer, we segregate it, we make concrete aggregates, we wash it and the other materials and then screen that to size and then the over size is run through our crusher to various sizes of rock.

"*  *  *  *  *

"Q  And what percentage, just approximately of your total that you obtain, we'll say in a given year, what percentage of that would be represented by concrete rock?

"A  Well, last year, I would think, well, sand and rock you consider a true mix concrete aggregate. Last year I would think maybe 80 or 90 or 175 total was concrete aggregate. That's just off my head.

"A  How much of that actually went to David (sic) and Peterson?

"A  I would say that 30 or 40,000 went to Davidson. Peter-

In our opinion, insofar as the trucks in question were used for hauling sand and gravel that was processed, stockpiled and sold to "ready-mix" concrete operators, such transportation was "in connection with plaintiffs' sand and gravel business," rather than "in connection with highway or construction projects," regardless of the ultimate use of the concrete.[④]

It also appears from the record that plaintiffs operate an asphalt plant at the same location as its rockcrusher and haul asphalt "mix" for use by the State Highway Department as an "overlay" in highway maintenance, as distinguished from original construction. How much or what percentage of the sand and gravel in question was used for that purpose also does not appear and the question whether such maintenance work would constitute "highway or other construction projects" was not briefed by plaintiffs.

■ It does not appear from the record, however,

─────────────

son is a new operation, very small, maybe 8 or 10 and the balance to True Mix and Medford Concrete in Medford but we deliver to all of them.

"Q You don't actually deliver any of this product to a highway project, do you?

"A We deliver it to the processing plant for ready mix concrete, we fill their bin and then they process it and haul the ready mix.

"Q And is this at a work project or is this at some permanent plant they have?

"A Well, these are permanent plants that we serve.

"* * * * *"

[④] Much of the briefs of both parties is devoted to a discussion of whether ORS 767.335(3) is an "exemption" from the highway use tax, so as to be strictly construed against the taxpayer, or provides for flat fees as an "alternate" to such a tax, so as not to be subject to that rule of statutory interpretation. In our opinion, it is also unnecessary to decide that question because we believe that under any proper rule of statutory interpretation the terms of this statute have no proper application to the hauling of sand and gravel for processing, stockpiling and sale to operators of ready-mix concrete plants, regardless of the ultimate use of the concrete.

how much, if any, of the sand and gravel processed in plaintiffs' rockcrusher during the period in question was then hauled as sand or gravel directly to the site of any highway or other construction project, either by plaintiffs or by anyone else.

In this state of the record, we conclude that the trial court could not properly find that plaintiffs had sustained their burden to prove by "clear and satisfactory evidence" that the order of the Commissioner was "unreasonable or unlawful" in holding, in effect, that the hauling in question was not done by "vehicles * * * used exclusively in the transportation of sand, gravel * * * in connection with highway or other construction projects," as required by the terms of ORS 767.335(3) in order to qualify for payment of a flat fee "in lieu" of highway use taxes on a mileage basis.

■ Plaintiffs offered evidence that a representative of the Commissioner had approved payment of flat fees by plaintiffs for a previous period. Also, on motion by the plaintiffs, an order was entered by the trial court under which plaintiffs were permitted to offer evidence to the Commissioner to show that other sand and gravel haulers in various other parts of the state had been allowed by representatives of the Commissioner to pay flat fees, rather than highway use taxes on a mileage basis.[9]

The extent to which the operations of such sand

---

[9] The trial court also made the following finding of fact:

"That various offices of the Defendant have authorized and permitted various other operations similar to Plaintiffs' operation to use the flat fee rate. The testimony taken in the supplemental hearings before the Defendant produced evidence of taxpayers being permitted to operate under the interpretation placed upon the statute by the Plaintiffs, with the permission and at times the direct advice of Defendant's offices in Grants Pass, Portland, McMinnville, Tillamook, The Dalles, Bend, and Eugene, and in at least one instance, upon direct advice given after consultation with the Salem office of Defendant."

and gravel haulers was "similar" to that of plaintiffs, as described above, does not appear. It does appear, however, that at least some of such haulers may not have made clear the nature of their hauling operations in discussions with representatives of the Commissioner, most of whom appear to have been personnel in local offices of the Commissioner.

On the contrary, evidence was offered through the Commissioner's Auditor Supervisor that the Commissioner had maintained the same position since 1950 and that since then the supervisors had instructed the auditors that the law required "delivery of the material to a construction project, specifically," in order to qualify for payment of a flat fee, although there were "no rules or regulations" to that effect.

In any event, we hold that the evidence offered by plaintiffs was not sufficient to prove by "clear and convincing evidence" that the Commissioner had previously construed this statute by long continued "practical administrative construction" in such a manner as to permit payment of a flat fee for the hauling of sand and gravel by plaintiffs to their processing plant under the facts as shown by the record in this case, much less to establish an estoppel which would bar the Commissioner from enforcing payment of highway use taxes on a mileage basis for plaintiffs' operations during the period in question in this case.

For all of these reasons, the decree of the trial court is reversed and this case is remanded with instructions to reinstate the order of the Commissioner which plaintiffs sought to set aside by this suit.

Reversed and remanded.